UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JARED WILLIAM BURKE, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:20-CV-9 SRW |
| | ) | |
| ANDREW M. SAUL, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on review of an adverse ruling by the Social Security Administration. The Court has jurisdiction over the subject matter of this action under 42 U.S.C. § 405(g). The parties have consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a Brief in Support of the Complaint. ECF No. 17. Defendant filed a Brief in Support of the Answer. ECF No. 25. Plaintiff filed a Reply. ECF No. 26. The Court has reviewed the parties' briefs and the entire administrative record, including the transcripts and medical evidence. Based on the following, the Court will affirm the Commissioner's decision.

## I.      Factual and Procedural Background

On March 10, 2009, Plaintiff Jared William Burke protectively filed an application for a period of disability and disability insurance benefits ("DIB") under Title II, 42 U.S.C. §§ 401, *et seq.* Tr. 264, 655-58. In a revised determination issued on December 2, 2010, Plaintiff was found disabled commencing on October 1, 2008. Tr. 265-66, 343-44. On January 28, 2013, Plaintiff applied for child's insurance benefits under Title II on the record of his father, Jared W. Burke.

1

Tr. 662-65. On March 12, 2013, Plaintiff was awarded child's insurance benefits based on disability as of October 1, 2008. Tr. 267-68.

In December 2014, the agency assessed Plaintiff's eligibility for continued disability and determined his entitlement to DIB and child's insurance benefits had ceased on December 1, 2014 due to medical improvement. Tr. 270-72, 348-55. Plaintiff requested reconsideration of the decision. Tr. 356. A hearing was held on March 3, 2014, Tr. 359-69, and the agency affirmed the determination on April 13, 2015. Tr. 377-86. Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 387.

On April 14, 2016, Plaintiff and counsel appeared for a hearing before ALJ Robert S. Robison where Plaintiff, his mother, and vocational expert ("VE") Bob Hammond testified. Tr. 56-110. On April 27, 2016, the ALJ upheld the agency's decision to terminate Plaintiff's benefits. Tr. 277-99. On June 14, 2017, the Appeals Council remanded the case with instructions for the ALJ to consider whether there was any additional period of disability after December 1, 2014, discuss Plaintiff's medical improvement and its effect on his residual functional capacity ("RFC"), weigh the opinion of a non-medical source, and obtain additional VE testimony if needed. Tr. 10, 300-04.

On November 20, 2017, ALJ Nathaniel Plucker held a hearing where Plaintiff, his mother, and VE Kristine Skahan, M.S. testified.[1] Tr. 112-63. On December 27, 2017, ALJ Plucker upheld the agency's decision to terminate Plaintiff's benefits. Tr. 305-34. On May 29, 2018, the Appeals Council remanded the case to address the following:

- Give further consideration to the treating source opinion of Dr. Brad Robison, M.D. regarding his evaluation of the listing criteria and functional limitations and explain the weight given to his opinion;

---

[1] The original ALJ, Robert S. Robison, retired after the Appeals Council issued its remand order.

2

- Evaluate Plaintiff's alleged disability pursuant to the continuing disability review adult sequential evaluation process, considering the entire period at issue through the date of the decision;

- Further consider Plaintiff's maximum RFC during the entire period at issue and provide rationale with specific references to the evidence of record in support of the assessed limitations, including evaluation of the treating source opinions and the weight given to the opinions; and

- If warranted by the expanded record, obtain evidence from a VE to clarify the effect of the assessed limitations on the Plaintiff's occupational base with hypothetical questions reflecting the specific capacity/limitations established by the record as a whole; to identify examples of appropriate jobs, stating the incidence of such jobs in the national economy; and identifying and resolving any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles ("DOT") and its companion publication, the Selected Characteristics of Occupations.

Tr. 11, 335-39.

After remand, ALJ Plucker held two additional administrative hearings on February 6, 2019 and March 27, 2019. Tr. 165-99, 201-62. Plaintiff and VE Ricardo Buitrago, Psy.D. testified at both hearings. VE Holly Berquist testified at the final hearing. On June 11, 2019, the ALJ determined Plaintiff was not disabled as of December 1, 2014 and upheld the agency's cessation of his benefits. Tr. 10-35. On November 9, 2016, the Appeals Council denied Plaintiff's request for review. Tr. 1-6. Accordingly, ALJ Plucker's decision stands as the Commissioner's final decision.

With regard to Plaintiff's testimony, medical records, and work history, the Court accepts the facts as presented in the parties' respective statements of facts and responses. The Court will discuss specific facts relevant to the parties' arguments as needed in the discussion below.

## II.     Legal Standard

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* at § 1382c(a)(3)(B).

Where an individual has been granted disability benefits, his continued entitlement to such benefits must be reviewed periodically. 20 C.F.R. §§ 404.1594(a), 416.994(a). "The Commissioner may terminate benefits to a person previously adjudged to be disabled upon substantial evidence that the individual's condition has improved." *Bennett v. Colvin*, 174 F. Supp. 3d 1031, 1037 (E.D. Mo. 2016). "When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where he is able to perform substantial gainful activity." *Delph v. Astrue*, 538 F.3d 940, 945 (8th Cir. 2008) (citing 42 U.S.C. § 423(f)(1)). "This 'medical improvement' standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits." *Id.*

The continuing disability review process involves a sequential analysis of up to eight steps for the Commissioner to determine. For a Title II claim, these steps include: (1) whether the claimant is engaging in substantial gainful activity; (2) whether the claimant has an impairment

or combination thereof that meets or equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (3) whether there has been medical improvement as defined as any decrease in the medical severity of the impairment(s) based on improvement in the symptoms, signs and/or laboratory findings; (4) whether the medical improvement is related to the ability to work, which results in an increase in the claimant's ability to perform basic work activities; (5) whether an exception to medical improvement applies; (6) whether all of the claimant's current impairments in combination are severe; (7) if the impairment(s) is severe, whether the claimant has the residual functional capacity based on all current impairments to perform past relevant work; (8) if unable to do past work, whether the claimant can do other work given the residual functional capacity assessment, age, education, and past work experience. 20 C.F.R. §§ 404.1594(f)(1)-(8), 416.994(b)(5)(i)-(vii).

The Court will affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). This standard is the same for continuing disability review cases. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003) (citing *Muncy v. Apfel*, 247 F.3d 728, 730 (8th Cir. 2001)). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Id.* "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

### III.    The ALJ's Decision

Applying the foregoing eight-step analysis, the ALJ found the following:

1.  The most recent favorable medical decision finding that the claimant was disabled is the determination dated December 2, 2010. This is known as the "comparison point decision" or CPD.

2.  At the time of the CPD, the claimant had the following medically determinable impairments: epilepsy, attention deficit hyperactivity disorder (ADHD), anxiety with anger issues, borderline intellectual functioning, and a learning disorder. These impairments were found to result in the substantial loss in ability to perform the mental demands of even unskilled work on a sustained and continuous basis.

3.  From December 1, 2014 through the claimant's date last insured, the claimant has not engaged in substantial gainful activity (SGA) (20 CFR 404.1594(f)(1)).

4.  The medical evidence establishes, since December 1, 2014 and through the claimant's date last insured, the claimant has had the following medical determinable impairments: epilepsy, a seizure disorder, attention deficit hyperactivity disorder (ADHD), impulse control disorder, borderline intellectual functioning, mood disorder alternatively diagnosed as major depressive disorder, and a learning disorder. These are the claimant's current impairments.

5.  Since December 1, 2014, and through the claimant's date last insured, the claimant has not had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

6.  Medical improvement occurred on December 1, 2014 (20 CFR 404.1594(b)(1)).

7.  Since December 1, 2014, and through the claimant's date last insured, the impairments present at the time of the CPD decreased in medical severity to the point where the claimant had the residual functional capacity to perform at a full range of work at all exertional levels with the following non-exertional limitations: he could not climb ladders, ropes, or scaffolds. He would have needed to avoid hazards such as unprotected heights and moving or dangerous machinery. He was limited to work involving simple, routine tasks and simple work-related decisions. He was restricted to low stress work defined as involving no interaction with the public and only occasional interaction with coworkers and supervisors. He was further limited to work involving only occasional decision-making and occasional changes in the work setting.

6

8.  The claimant's medical improvement is related to the ability to work because it resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(c)(3)(ii)).

9.  Since December 1, 2014, and through the claimant's date last insured, the claimant has continued to have a severe impairment or combination of impairments.

10. Based on the impairments present since December 1, 2014, through the date last insured, the claimant continued to have the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he needed to avoid climbing of ladders, ropes, or scaffolds, as well as work around hazards such as unprotected heights and moving and dangerous machinery. The claimant was further limited to work involving simple, routine tasks and simple work-related decisions. He was restricted to low stress work, defined as work that involves only occasional decision-making, only occasional changes in the work setting, and no fast-paced work with strict production quotas such as assembly line work. The claimant was restricted from work involving interaction with the public and more than occasional interaction with coworkers and supervisors.

11. Since December 1, 2014, and through the claimant's date last insured, the claimant has been unable to perform past relevant work (20 CFR 404.1565).

12. On December 1, 2014 and through his date last insured, the claimant was a younger individual age 18-49.

13. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

14. Since December 1, 2014, and through the claimant's date last insured, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

15. Since December 1, 2014, and through the claimant's date last insured, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present since December 1, 2014, and through the date last insured, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

16. The claimant's disability ended on December 1, 2014, and the claimant did not become disabled again through his date last insured, March 31, 2017 (20 CFR 404.1594(f)(8)).

17. The claimant's disability ended on December 1, 2014 at age 25, so he cannot establish disability prior to attainment of age 22, and he is outside the relevant period to be eligible for adult child's disability benefits on the record of the wage earner (20 CFR 404.350).

18. The claimant's date last insured is March 31, 2017, and the ALJ properly considered all evidence relevant to the claimant's disability prior to that date.

Tr. 14-34.

## IV.    Discussion

Plaintiff challenges the ALJ's decision on two grounds: (1) the ALJ's assessment of his subjective complaints was insufficient because it failed to account for "cost and plateauing" and failed to consider the full extent of his work limitations; and (2) the ALJ's assessment of the opinion evidence of record was contrary to agency regulations. ECF No. 17.

For the following reasons, the Court finds Plaintiff's arguments to be without merit as the ALJ's decision is based on substantial evidence and is consistent with the Social Security Administration Regulations and case law.

### A.  The ALJ's Evaluation of Plaintiff's Subjective Complaints

Plaintiff argues the ALJ's determination regarding the credibility of his subjective complaints was inconsistent with the record and not supported by substantial evidence. Specifically, Plaintiff contends the assessment improperly relied on medical records documenting his request to reduce visits with his treating physician, the stability of his conditions, and decreases in medication dosages. Plaintiff argues these circumstances were the result of Plaintiff's concern for costs of medical care in addition to the fact that his symptoms plateaued. Plaintiff further argues the ALJ's reliance on his ability to run his own lawn care

company and assist his friend who owned an auto sales business was improper because Plaintiff required special accommodations. Plaintiff also argues the ALJ placed too much reliance on Plaintiff's ability to live on his own and assist in taking care of his girlfriend's children because the record also showed he had difficulties managing his money and frustrations with being a partial caretaker.

In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, the Commissioner must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017).[2] When evaluating a Plaintiff's subjective statements about symptoms, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

*Id.* at 1322 ("*Polaski* factors").

SSR 16-3p states "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the

---

[2] This analysis was previously described as an analysis of the "credibility" of a claimant's subjective complaints. However, the Commissioner has issued a new ruling, applicable to decisions made on or after March 28, 2016, that eliminates the use of the term "credibility" when evaluating subjective symptoms. SSR 16-3p, 2017 WL 5180304, at *1-*2 (Oct. 25, 2017). This ruling clarifies that "subjective symptom evaluation is not an examination of an individual's character." *Id.* at *2. The factors to be considered remain the same under the new ruling. See id. at *13 n.27 ("Our regulations on evaluating symptoms are unchanged."). *See also* 20 C.F.R. §§ 404.1529; 416.929.

adjudicator evaluated the individual's symptoms." SSR 16-3p, 2007 WL 5108034, at *10. However, "[t]he ALJ is not required to discuss each *Polaski* factor as long as 'he acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore*, 572 F.3d at 524)).

The Court finds the reasons offered by the ALJ in support of his evaluation of Plaintiff's subjective complaints are based on substantial evidence. The ALJ's determination is set out in an approximately 25-page, single spaced opinion, which summarizes the approximately 2,000-page record, including the extensive procedural history of this case and medical reports. In the determination, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the objective medical and other evidence[.]" Tr. 20. In making this decision, the ALJ relied on Plaintiff's own statements, non-medical source statements, and the medical record consisting of opinions and notes from his treating physicians as well as non-examining physicians.

The ALJ considered the November 2017 hearing testimony from Plaintiff and his mother. Tr. 20, 24, 111-63. Plaintiff testified he was able to live on his own in a rented house for three and a half years but moved back in with his parents shortly before the hearing because his landlord decided to no longer use the home as a rental property. Tr. 121. Plaintiff did not testify to any limits in his performance of daily activities when he lived alone. Tr. 131. Since 2013 Plaintiff has been running his own lawn care company working fifteen to twenty-five hours per week, depending on the season, performing activities such as mowing lawns, raking leaves, and shoveling snow. Tr. 121-23. Plaintiff's clients originate from social media marketing and word of mouth. Tr. 141. Plaintiff performs most of the manual labor himself, but his parents handle the paperwork side of his business. Tr. 140-41. Plaintiff admitted he would "probably" be able to do

10

the same lawn care work for an employer as long as his supervisor was not constantly watching him. Tr. 133. Additionally, Plaintiff assists his friend, who owns an auto sales shop, to wash and drive cars. Tr. 138. When asked whether he would accept a full-time position at the auto sales shop if such a position was offered to him, Plaintiff stated he would accept as long as he could stop working in the spring and summer when he tends to be busier with his lawn care company. Tr. 139.

Prior to starting his business, Plaintiff worked for approximately six months stacking bricks for a masonry company. Tr. 123. He was terminated from his position after he "went off" on a co-worker who made fun of him. Tr. 126. Plaintiff explained he did not feel like he could maintain full-time employment because his past supervisors mistreated and teased him, and he had difficulties following directions. Tr. 20, 125-28. Plaintiff stated he was fired from most jobs because of his "temper" and his responses to mistreatment from co-workers or supervisors. Tr. 20, 127. Despite interpersonal communication issues, Plaintiff stated he did not have difficulties reporting to work. Tr. 142-43, 147.

For two to three years after Plaintiff lost his benefits in 2014, he was unable to afford some of his medications, but was able to resume Abilify, an anti-depressant prescription, which he claims makes him feel better. Tr. 20, 24-25, 130-31, 142. Plaintiff reported he last experienced a seizure six to nine months prior to the hearing and it was likely because he missed a dose or more of his medications. Tr. 20, 131, 147. Plaintiff admitted he had trouble maintaining medication compliance apart from the brief period he stopped for financial reasons. *Id.* Plaintiff admitted to past substance abuse issues which he claimed affected his ability to work but stated he had not used methamphetamines or marijuana for approximately four to six months prior to

11

the hearing. Tr. 135-37, 142. When he is not working, Plaintiff tends to spend time on the computer and be with friends because he does not like being alone. Tr. 145-46.

Plaintiff's mother testified that she assists him with business recordkeeping, such as maintaining customer lists, invoices, and daily jobs. Tr. 150, 156. She explained Plaintiff often gets distracted, forgets to collect payments, and has difficulties recalling which jobs he performed in a particular day. Tr. 150, 154. She testified Plaintiff was bullied at his masonry job and had difficulties fitting in with his co-workers. Tr. 151-52. She recalled when Plaintiff stopped taking his medications for approximately nine months and attributed it to his friends who encouraged him to substitute his prescriptions with marijuana in conjunction with his general forgetfulness. Tr. 155-56. Since Plaintiff has been back on Abilify, she believes it has helped his depression symptoms. *Id.* In addition to this testimony, Plaintiff's mother submitted a written third-party statement providing substantially the same information as her hearing testimony. Tr. 29, 933-34, 1012-13, 1057-63. The ALJ noted Plaintiff's mother did not indicate an inability for Plaintiff to relate to his lawn care customers, and she admitted that much of his symptom exacerbation was associated with a lack of consistency with medication compliance. Tr. 29.

Based on Plaintiff's testimony and self-reported abilities, the ALJ considered his activities of daily living. Specifically, the ALJ noted he had a valid driver's license and during the period at issue would drive for his own business needs; washed and transported vehicles as needed for his friend; prepared simple meals; spent time with friends; cleaned the house; and performed yard work. Tr. 16-17. The Court notes Plaintiff's Function Report supports these activities as well as an ability to maintain his personal care (dress, bathe, and shave) without assistance. Tr. 751. As for social activities, Plaintiff reported he spends time with others a couple of times each week in which he is able to "communicate . . . talk online, or on the phone, [and]

12

text." Tr. 755. He stated, however, he has problems getting along with others because he does not like people bossing him around or making fun of him when he cannot do what he wants to do. Tr. 756.

The ALJ further considered and assigned significant weight to the testimony of Dr. Ricardo Buitrago, Psy.D., a medical expert and Chief Psychologist at the Mental Health Center in Florida, who testified at the February 6, 2019 hearing. Tr. 29-31, 164-99. Dr. Buitrago reviewed Plaintiff's complete medical record from 2008 to 2017 and listed Plaintiff's severe mental health impairments as impulse control disorder, attention deficit hyperactivity disorder, major depressive disorder, borderline intellectual function disorder, and alcohol abuse disorder. Tr. 29, 170-71. Dr. Buitrago opined Plaintiff has mild to moderate limitations in understanding, remembering, or applying information; mild limitations in interacting with others; moderate limitations in concentration, persistence, and maintaining pace; and mild limitations in adapting or managing oneself. Tr. 29, 171. Dr. Buitrago testified Plaintiff, at minimum, should be able to understand simple instructions, engage in simple repetitive tasks independently, maintain attention and concentration for simple tasks, make simple work related decisions independently, work with others with no limitations, and complete a six to eight hour work day for five days per week without any major psychologically based interruptions due to symptoms. *Id.* Dr. Buitrago opined Plaintiff's cognitive and emotional deficits and compromised functioning was managed with medication without the need for any psychological treatment. Tr. 196.

Dr. Buitrago believed Plaintiff's medical records supported his ability to perform unskilled work. In making this conclusion, he cited to notes from Plaintiff's treating provider, Dr. Robison, who assessed Plaintiff as having a stable mental status, little anxiety, mild anxiousness, mild depression, mild dysphoria, and a lack of psychiatric hospitalizations, as well

13

as somewhat improved intellectual functioning as reflected from his IQ scores. Tr. 30, 172. Dr.

Buitrago considered Plaintiff's ability to perform lawn work as a business, establish a

relationship with a girlfriend, live on his own, and purchase a new truck. *Id.* Dr. Buitrago cited to

a job report, dated February 27, 2016, from the office manager at his prior masonry job who

rated Plaintiff's work as satisfactory in comparison to others, did not note irritability as an issue,

and only noted tardiness as a concern. Tr. 187.

At the request of Plaintiff's representative, a supplemental hearing was held before the

ALJ on March 27, 2019, where Dr. Buitrago testified again after he had the opportunity to

review additional medical records, including a 2017 neuropsychological test performed by Dr.

Stephen Jordan, Ph.D., which indicated Plaintiff had "marked" limitations. Tr. 201-40. Dr.

Buitrago testified the additional records did not change his opinions regarding Plaintiff's mental

functioning as the record continued to reflect "stable" and "well managed" symptoms and better

intellectual functioning. Tr. 212, 226, 230. Dr. Buitrago distinguished his opinion from Dr.

Jordan's stating he had the opportunity to review Plaintiff's entire medical record while Dr.

Jordan did not. Tr. 233. Dr. Buitrago again cited to Dr. Robison's medical records which

supported Plaintiff as being "intact with mild anxiety" and a need for appointments every two or

three months rather than every week. Tr. 238.

The ALJ considered the Individualized Education Program ("IEP") Plaintiff was

approved for when he was in senior high school. Tr. 20-21, 1201-71. The IEP, dated April 19,

2007, indicated he had difficulties with inattention, distractibility, completion of tasks, and

impulse and anger control as well as understanding, comprehending, and remembering

instructions. Tr. 20-21, 1201-71. The ALJ noted Plaintiff's IQ scores from an October 2007

evaluation, in which he scored a verbal IQ of 79, a performance IQ of 79, and a full-scale IQ of 77. Tr. 21, 1237, 1263.

The ALJ considered the February 5, 2016 assessment from Nancy Strothmann, M.A., Plaintiff's vocational rehabilitation counselor and assigned it limited weight. Tr. 28, 857-58. The one-page letter indicated Plaintiff participated in a Vocational Rehabilitation Program. Ms. Strothmann wrote Plaintiff "struggles with following direction, retaining information, processing information, recalling information, short and long term memory loss, difficulty with multitasking, social skills, disorganization, and difficulty expressing himself to others." Tr. 858. Ms. Strothmann found it "doubtful" Plaintiff could maintain full time employment and opined that any part time employment opportunities would require him to receive "extensive job coaching." *Id.* The ALJ found Ms. Strothmann's opinion contrary to Plaintiff's "actual demonstrated abilities in past work activity such as working for a friend who owns a car business while maintaining his own lawn service business" in addition to Plaintiff's own testimony that he believed he could work full time for his friend or for another lawn care company if he was not constantly supervised. Tr. 28.

The ALJ considered a one-page letter submitted by Patricia Karanthanos, Ph.D., a lawn care customer of Plaintiff, who wrote: "although he is a hard worker, he has some cognitive difficulties which prevent him from being full-functioning." Tr. 28-29, 935. Dr. Karanthanos admitted she was not familiar with his detailed health problems but was once worried he would be unable to care for her lawn due to a "gash on his head" which she attributed to a seizure. *Id.* She further mentioned he lacked appropriate equipment to complete her yard work. *Id.* The ALJ attributed little weight to her statement because the medical record indicated Plaintiff's seizures were controlled with medication and occurred infrequently in the evening. The ALJ considered

15

Plaintiff's potential for seizures in the RFC determination by limiting his work to account for no exposure to hazards. The ALJ remarked that if Plaintiff was so incapable of maintaining his business "it is unclear how he has continued to obtain jobs and perform this for several years." Tr. 28-29.

The ALJ cited to the October 13, 2014 Progress Note from Plaintiff's treating psychiatrist, Dr. Robison, to support Plaintiff's medical improvement. Tr. 1652-53. In this report, Dr. Robison described "overall progress" as Plaintiff self-reported doing "relatively well" with "an occasional day here and there when he [was] irritable and moody," but "those symptoms seem[ed] to go away quickly." Tr. 1652. A mental status exam revealed he was alert and oriented, calm, pleasant, and cooperative. *Id.* Dr. Robison wrote "Plaintiff has been growing and maturing over the last few years" and seemed to tolerate the discontinuance of his Abilify prescription. *Id.* Dr. Robison indicated "there is data to support that many children and adolescences" with Plaintiff's similar diagnoses "improve over time and by mid-twenties are able to be off of medications successfully." *Id.* Dr. Robison noted Plaintiff's "main issue" was his use of marijuana on a "chronic basis." *Id.*

The ALJ cited to Plaintiff's January 9, 2015 visit with Dr. Robison, in which Plaintiff chose to go back on Abilify due to an increase in irritability and inflexibility. Tr. 21, 1704. Dr. Robison wrote it was "very positive" for Plaintiff to independently recognize the development of problems "before things got out of control," and after going back on Abilify, Plaintiff reported he "returned to baseline with fair to good control of irritability." A few weeks after the January appointment, Plaintiff requested he be seen only two times per year. Tr. 1704. The ALJ found these records, including Plaintiff's desire to be treated less, to support the conclusion that medication was controlling his symptoms. Tr. 21. See *Shelton v. Chater*, 87 F.3d 992, 995 (8th

16

Cir. 1996) (upholding the adverse credibility determination in part because claimant's problems appeared to be controlled with medication).

The ALJ considered Dr. Robison's two-page letter to the Disability Determinations Hearing Officer, dated May 14, 2015, which was written at the request of Plaintiff after he received notice of the cessation of his benefits due to medical improvement. Tr. 25, 1731-32. Dr. Robison summarized Plaintiff's medical conditions and opined it would be difficult for him to transition into a work setting. Tr. 1732. Dr. Robison noted, however, Plaintiff's symptoms had been relatively stable over the last year or two and he had significantly reduced or eliminated alcohol or marijuana use. *Id.* The ALJ found this letter to be contrary to Dr. Robison's October 13, 2014 Progress Note which approved Plaintiff's discontinuance of the Abilify prescription, illustrating medical improvement, and his prior assessment that many adolescents with Plaintiff's mental impairments improve over time. Tr. 25. It is also contrary to Plaintiff's history of being able to run his own lawn care company, albeit with the help of his parent's managing the paperwork, and records showing controlled symptoms with medication compliance.

The ALJ cited to Dr. Robison's August 12, 2015 Progress Note which described Plaintiff as "relatively stable." Tr. 1832. Dr. Robison noted he increased Plaintiff's Abilify dosage, and as a result, "his emotional lability and irritability [were] clearly improved." Tr. 22, 1832. Plaintiff reported he had a seizure while he was sleeping a few weeks prior to the appointment but admitted he did not take his medication "a day or two before the seizure." *Id.* Plaintiff further reported he was working at his lawn care company as well as TJ Max and Food Giant Industries stocking shelves and unloading trucks. *Id.* Plaintiff described stocking shelves as "a bit overwhelming" and unloading trucks as "manageable" despite feeling anxious around others. *Id.*

A mental status exam revealed he was alert and oriented, calm, pleasant, and cooperative. *Id.*
Plaintiff also told Dr. Robison he never had difficulties driving due to seizures. *Id.*

On October 7, 2015, Dr. Robison again described Plaintiff as "relatively stable" with the
same mental exam results. Tr. 1830. Dr. Robison noted Plaintiff was "working jobs
consistently," and at that time, his disability appeal was still pending. *Id.* Dr. Robison wrote in
his notes that it was "going to be difficult for [Plaintiff] to maintain long term gainful
employment and be able to meet financial obligations including medical costs and medications."
The ALJ acknowledged this statement. However, the ALJ also considered this same record
indicated Plaintiff's failure to maintain medication compliance, which affected the overall
severity of his symptoms. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("[a]
failure to follow a recommended course of treatment . . . weighs against a claimant's
credibility").

On May 19, 2016, Plaintiff returned to Dr. Robison for a follow-up appointment, in
which he was again described as "relatively stable," but also mild to moderately anxious because
of an unfavorable judgment regarding his disability benefits. Plaintiff told Dr. Robison he
stopped taking his medicines for financial reasons after his benefits were discontinued; although,
his mother convinced him to recommence his anti-seizure prescription. Tr. 23, 1823. Dr. Robison
noted it was "difficult to say at this point, the role marijuana may be continuing to play in
symptoms," and he was advised "marijuana could perpetuate a mood and anxiety disorder as
well as focus and concentration difficulties." *Id.* Dr. Robison encouraged Plaintiff "that he can
learn to be independent even though it may be difficult." *Id.*

On April 6, 2016, Dr. Robison indicated in a Progress Note that Plaintiff had quit his job
as a hospital laundry worker because the dirtiness of the linens and the interactions with

coworkers caused him anxiety. Tr. 1824. Dr. Robison wrote "it would be difficult for [Plaintiff] to manage fully independently although that is still the long-term goal." Tr. 1825. The ALJ acknowledged Plaintiff's documented difficulties with social interactions and stated he accounted for them by limiting social contact in the RFC determination. Tr. 23. The ALJ referred to Plaintiff's many years of performing yard work supported the conclusion that he could perform "simple, routine tasks with limited social interaction with the additional limitations in the established residual functional capacity." Tr. 23.

On June 30, 2016, Plaintiff, accompanied by his mother, attended an appointment with Dr. Robison. Tr. 23, 1821. Plaintiff reported he stopped taking his medications and did not want to restart even though his mother found a bottle containing a one-month supply of Abilify. *Id.* Dr. Robison stated his belief that "chronic marijuana use [was] a contributing factor to the presentation, but he [was not] willing to discontinue use." *Id.*

On July 18, 2016, Plaintiff reported to Dr. Robison that he resumed his Abilify prescription but was vague on how many pills he had left. Tr. 23, 1819. Dr. Robison noted Plaintiff had a "long-standing issue" with medication compliance, and it was clear he "improved from his last visit with less anxiety and less dysphoria and overall, more hopefulness" due to his choice to resume Abilify. *Id.* Plaintiff's failure to follow the recommended course of treatment weighs against his credibility. *Guilliams*, 393 F.3d at 802 (citing *Gowell v. Apfel*, 242 F.3d 793, 797 (8th Cir. 2001)). *See also Wildman v. Astrue*, 596 F.3d 959, 968-69 (it is permissible for ALJ to consider claimant's non-compliance with prescribed medical treatment).

On November 3, 2016, Plaintiff reported marijuana and methamphetamine use to Dr. Robison and acknowledged his awareness such behavior was "dangerous and unhealthy." Tr. 23, 1814. Plaintiff told Dr. Robison he did not want to pursue any more aggressive treatment,

partially because he was "only marginally motivated for treatment" and partly due to a concern

for finances. *Id.* Despite Plaintiff's negative behavior, his mental status exam revealed he was

alert and oriented, calm, mild-to-moderately dysphoric, and mildly anxious with linear and goal-

directed form of thought. *Id.*

In addition to Dr. Robison's treatment and corresponding notes, the ALJ also considered

the opinions of Plaintiff's treating neurologist, Dr. Robert Gardner, Jr. The ALJ found the May

14, 2015 visit with Dr. Gardner "noteworthy" because it reflected his seizures were infrequent

and generally caused by medication non-compliance. Tr. 21, 1743. The record indicated Plaintiff

experienced one seizure in March of 2015 and one seizure in November of 2014. Although Dr.

Gardner included in his notes that Plaintiff would probably not be able to maintain gainful

employment due to seizure activity, the ALJ found such an opinion to be contrary to the record

documenting infrequent seizures that only occurred at night. Tr. 21. The Court further notes there

is no record of Plaintiff experiencing a seizure during work hours or documented difficulties with

his ability to operate machinery for his lawn care company or drive vehicles for his friend's auto

sales business.

The ALJ found Dr. Gardner's November 19, 2015 Progress Note to further suggest

Plaintiff's medical stability as to seizure activity. Tr. 22, 1742. Plaintiff reported his belief he

suffered from one seizure while he was sleeping "at some point in July," but it was more than

likely attributed to Plaintiff's medication non-compliance as he admitted "he forgets 2-3 doses

per week." Tr. 22, 1742. On February 3, 2016, Plaintiff saw Dr. Gardner for a follow up

appointment and reported only one seizure since his last visit in November which occurred at

night and due to medication non-compliance. Tr. 22, 1755, 1769. Dr. Gardener adjusted his

medications to make compliance more manageable. *Id.* On March 3, 2016, Plaintiff returned to

Dr. Gardner for an early follow-up as he reported side effects from his new medication regimen. Tr. 22-23, 1770. Dr. Gardner determined his side effects appeared to be caused by non-compliance as it was discovered Plaintiff "had not been filling one of his seizure medications since last May." *Id.* On May 27, 2016, Dr. Gardner indicated Plaintiff unilaterally took himself off of all medication. Plaintiff denied the onset of seizures despite this drastic action. *Id.* Due to his family's encouragement, he went back on the anti-seizure medication, and Dr. Gardner reduced the dosage since Plaintiff did not experience a seizure when he discontinued use. *Id.* On January 6, 2017, Dr. Gardner indicated Plaintiff had no known seizures since January of 2016 as he "has a good system of medication monitoring with parents and reminder alarms" and has "good control when compliant." Tr. 23, 1773-75.

In addition to the information provided in Dr. Gardner's medical records, the ALJ noted the infrequency of Plaintiff's seizures was also evidenced by Plaintiff's mother's submission of a personal seizure log. Tr. 24, 989-97. The log reported Plaintiff to have had no seizures from January 2013 to October 2014, two to three seizures at the end of 2014, two seizures in 2015, and two seizures in 2017. *Id.*

The ALJ considered and gave some weight to two Physical RFC Assessments submitted by state agency reviewing physicians, John Marshall Jung, M.D. and Cynthia Bleichroth, M.D. Tr. 25, 1681-87, 1724-30. Both listed Plaintiff's primary diagnosis as complex partial seizures with no exertional limitations. Tr. 1681-82, 1724-25. Dr. Jung's Assessment, dated December 8, 2014, noted Plaintiff had not experienced a seizure for approximately eight months, was not being treating for asthma, did not complain of any major medication side effects, lived alone, and was able to perform activities of daily living. Tr. 1683. He opined Plaintiff had the limitations of only occasionally climbing ramps, stairs, ladders, ropes, and scaffolds, with the need to avoid

concentrated exposure of machinery and height hazards. Tr. 1683-85. Dr. Bleichroth's opinion,

dated January 29, 2015, also noted the infrequency of Plaintiff's seizure activity, well-controlled

asthma, and ability to perform activities of daily living. Tr. 1726. He opined Plaintiff had the

limitation of only occasional climbing of ramps, stairs, ladders, ropes, and scaffolds, with the

need to avoid concentrated exposure of machinery, height hazards, fumes, odors, dusts, gases,

and poor ventilation. Tr. 1724-30. The ALJ gave little weight to Dr. Bleichroth's asthma related

restriction as the medical evidence did not support breathing issues. Tr. 25.

The ALJ also considered and gave some weight to two Mental RFC Assessments

submitted by state agency reviewing psychologists, James W. Morgan, Ph.D., and Gretchen

Brandhorst, Psy.D., from December 2014 and January 2015, respectively. Tr. 25, 1688-03, 1720-

23. The ALJ found greater limitations than those provided by Dr. Morgan and Dr. Brandhorst in

the areas of social interaction and adaption based on the ALJ's review of medical record. Both

psychologists assessed Plaintiff as having moderate limitations in his ability to understand and

remember detailed instructions; carry out detailed instructions; accept instructions and respond

appropriately to criticism from supervisors; and respond appropriately to changes in the work

setting. Dr. Morgan opined Plaintiff improved medically and was capable of sustaining

employment involving simple repetitive tasks in a low stress environment. Tr. 1691-92. In

making this decision, Dr. Morgan cited to Plaintiff's treating physician's notes describing him as

"relatively stable," his ability to manage without psychotropic medications, and his activities of

daily living. Tr. 1690.

The ALJ considered and gave some weight to a September 15, 2015 Psychological

Evaluation performed by evaluating physician M. Renee Patrick, Ph.D. Tr. 27, 1745-54. Dr.

Patrick observed Plaintiff to have normal speech, adequate use of gesture, reciprocity in

conversation, and no symptoms to indicate autism. Tr. 1747. The ALJ found the report notable as follows: (1) " there was some variability in the claimant's composite scores so his full scale IQ might not reflect his actual abilities;" (2) although "he worked at a slower pace, he evidenced good attention to detail and accuracy with fine motor control and visual motor dexterity;" (3) testing reflected only mild deficits in nonverbal short-term memory; and (4) there was some noted likelihood of his overreporting of symptoms. Tr. 27. The report also indicated Plaintiff would benefit from supported employment services and job sampling might help him find suitable employment. Tr. 27, 1750. The ALJ found this comment to suggest "the potential to perform some jobs with restrictions to account for the claimant's impairments." Tr. 27. In evaluating this assessment, the ALJ stated: "Dr. Patrick noted significant depressive symptoms that Dr. Robison's notes at that time do not reflect" and "given the claimant's ability to live alone for an extended period during the period at issue, the statements do not necessarily contradict medical improvement related to the ability to work." *Id.*

The ALJ gave little weight to a Psychiatric Evaluation, dated, May 22, 2017, by non-treating physician Dr. Stephen A. Jordan, and subsequent letter summarizing his findings at Plaintiff's request. Tr. 26, 1835-43, 1905-06. The evaluation determined Plaintiff would not be successful in independent living or competitive employment. Tr. 1905. The ALJ found this record to be irrelevant as it was dated after the designated period for review in this case; contrary to Plaintiff's demonstration of an ability to live on his own, work at his own lawn care company, and work at his friend's auto sales shop; and inconsistent with the entire medical record. Tr. 26-27.

The ALJ also considered and gave little weight to an August 18, 2016 Psychological Report by non-treating evaluator Price Gholson, Psy.D., who determined Plaintiff has been

incapacitated for twelve months or more. Tr. 27, 1756-64. The ALJ noted this evaluation was to support an application to receive healthcare benefits and not for SSI benefits, was submitted in a checklist format without a narrative explanation of the results of the mental status examination, and failed to indicate whether she reviewed Plaintiff's vast medical records. Tr. 27.

Plaintiff argues the ALJ improperly relied on medical records indicating his request to reduce visits with his treating physician and decrease medication dosages because those decisions were made due to Plaintiff's concern for medical care costs. While the record does indicate Plaintiff stopped taking Abilify for a few months after he received notice of cessation of his disability benefits, Tr. 1823, Plaintiff admitted he had trouble maintaining medication compliance apart from the brief period he stopped for financial reasons. Tr. 20, 131, 147. Plaintiff's mother testified he stopped taking his medications for approximately nine months but attributed the decision to his friends who encouraged him to substitute marijuana for his prescriptions, and Plaintiff's forgetfulness. Tr. 155-56. Noteworthy is the June 30, 2016 Progress Note from Dr. Robison who indicated Plaintiff stopped taking his medications and did not want to restart even though his mother found a bottle containing a one-month supply of Abilify. Tr. 821. This record evidences Plaintiff's voluntary, non-financially motivated choice to discontinue his medication despite availability. Additionally, on November 3, 2016, Plaintiff told Dr. Robison he did not want to pursue any more aggressive treatment partially because he was "only marginally motivated for treatment" and partly due to a concern for finances. Tr. 1814. Thus, the Court cannot agree the ALJ improperly relied on medical records which indicated Plaintiff's request to reduce visits with his treating physician and decreases in medication dosages. These decisions were not entirely financially motivated.

The Court also finds the ALJ did not err in his consideration of the stability of Plaintiff's conditions. The ALJ cited to various records from Dr. Robison, as summarized above, indicating Plaintiff was relatively stable, his symptoms were well-managed through medication, he was able to remain somewhat stable even when he unilaterally chose to discontinue his treatment plan. Plaintiff was also cognizant of the importance of resuming the medication regime after he felt his symptoms returning. Plaintiff argues a stable condition does not imply a lack of disability. However, it is clear from the ALJ's decision that Dr. Robison's notes regarding Plaintiff's general stability was only one factor in the totality of the medical evidence which the ALJ used to analyze Plaintiff's subjective complaints.

Plaintiff further argues the ALJ's reliance on his ability to run his own lawn care company and assist his friend who owned an auto sales business was improper to support his ability to maintain substantial gainful activity because Plaintiff required special accommodations. The Court disagrees. A plaintiff's ability to perform part-time work may be considered as part of the analysis. *See Finch v. Astrue*, 547 F.3d, 933, 935 (8th Cir. 2008); *Polaski*, 739 F.2d at 1322; *Gowell v. Apfel,* 242 F.3d 793, 798 (8th Cir. 2001) (finding it relevant to disability determination that claimant was able to work "for years with her impairments"); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("It was also not unreasonable for the ALJ to note that [the plaintiff's] daily activities, including part-time work . . . were inconsistent with her claim of disabling pain."). *See also* 20 C.F.R. § 416.971 ("The work . . . that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level"). Moreover, as the ALJ noted, Plaintiff testified he would "probably" be able to do the same work as he does in his business for an employer as long as his supervisor was not constantly watching him. Tr. 133. When asked

whether Plaintiff would accept a full-time position at the auto sales shop, if such a position was offered to him, Plaintiff stated he would accept as long as he could stop working in the spring and summer when he tends to be busier with his lawn care company. Tr. 139. Thus, Plaintiff's ability to work up to twenty-five hours per week at his lawn care company in addition to driving and washing cars for another company was permissibly considered as evidence of Plaintiff's mental ability to perform work despite an allegation of disability.

Plaintiff also argues the ALJ placed too much reliance on his ability to live on his own and assist in taking care of his girlfriend's children because the record also shows he has difficulties managing his money and frustrations with being a partial caretaker. The Court, again, cannot agree. Plaintiff's ability to live alone for three years, albeit with financial assistance from his parents, along with his ability to provide some care for his girlfriend's children, are activities of daily living which *Polaski* includes as a factor for an ALJ to use in assessing credibility. The 25-page opinion relies not only on Plaintiff's activities of daily living, but also extensively cites to medical evidence, a lack of persistent or debilitating medication side effects, Plaintiff's failure to comply with medical treatment, and, notably, his choice to engage in drug use which Dr. Robison found to undermine his treatment and potentially aggravate his symptoms. Thus, a review of the ALJ's decision shows the ALJ considered all evidence relating to Plaintiff's subjective complaints, including the various factors as required by *Polaski*.

After review of the record, the Court finds that the ALJ conducted a proper assessment of Plaintiff's symptoms, consistent with SSR 16-3p and the relevant regulations, and that his assessment is supported by substantial evidence. Moreover, the ALJ did not entirely discredit Plaintiff's subjective complaints as he limited his interaction with the public, co-workers, and supervisors in the RFC. The ALJ also limited him from unprotected heights and dangerous

machinery to account for the potential of seizure activity. To the extent the ALJ did not find all of Plaintiff's claimed symptoms to create limitations that should be included in the RFC, the ALJ did so only after conducting an appropriate analysis of the record and the relevant factors.

**B. ALJ's Assessment of the Opinion Evidence**

Plaintiff takes issue with the ALJ's determination to afford significant weight to the non-examining opinion of Dr. Buitrago, some weight to the examining opinion of Dr. Patrick, and limited weight to Dr. Robison's 2015 and 2017 treating opinions.

### *1. Dr. Buitrago*

The ALJ gave "significant weight to Dr. Buitrago's testimony that the claimant's mental conditions had improved since December 1, 2014 and that the improvement was related to the ability to work." Tr. 29. The ALJ summarized Dr. Buitrago's testimony at both the February and March 2019 hearings. Tr. 29-30. The Court notes Dr. Buitrago was the only witness at the February 2019 hearing which lasted for approximately 50 minutes, and he testified for an additional hour at the March 2019 hearing. Tr. 167, 199, 236. Dr. Buitrago reviewed Plaintiff's entire medical record, which included progress notes from treating physician Dr. Robison, and concluded Plaintiff's condition was generally stable and controlled with medication. Tr. 30. In providing his opinion, Dr. Buitrago stated he also considered Plaintiff's ability to live alone, perform lawn work as part of a personal business, establish a relationship with a girlfriend, and test with a slightly higher full-scale IQ score than he did in 1999. *Id.* Dr. Buitrago distinguished his conclusions of mild to moderate limitations to other non-treating source opinions of marked limitations by explaining there was no indication those sources were privy to all the testing and records he used to support his assessment. *Id.* After analyzing Dr. Buitrago's opinions in comparison to the entire medical record, the ALJ provided Plaintiff with a "slightly more

restrictive paragraph B criteria and functional limitations, including in social interaction based on third party reports and previous testimony by the claimant's mother." *Id.*

The regulations specifically state the ALJ should consider any non-examining doctors' opinions in making a disability determination. SSR 96-6p. The weight assigned to such opinions often relies on the degree to which the source provides supporting explanations for his or her opinion. 20 C.F.R. § 404.1527(c)(3) ("because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions"). In fact, in some cases, opinions from state agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014). In *Tindell v. Barnhart*, 444 F.3d 1002, 1006 (8th Cir. 2006), the Court found an ALJ could give greater weight to the opinion of a non-examining medical expert who testified at the hearing than to the treating social worker and to an examining consulting psychologist. The ALJ in *Tindell* had provided specific reasons for the weight given the differing opinions and sufficiently explained the inconsistencies which led him to give greater weight to the medical expert.

The Court concludes the ALJ appropriately evaluated the opinion of non-examining physician Dr. Buitrago and finds that his opinion is compatible with other evidence in the record and appropriately afforded it greater weight. As evidenced by the hearing transcripts in the record, Dr. Buitrago's testimony was based on a thorough review of Plaintiff's medical history. *See* 20 C.F.R. § 404.1527(d)(3) (non-examining sources are to be evaluated according to the "the degree to which these opinions consider all of the pertinent evidence in your claim"). Moreover, the ALJ provided detailed reasons for attributing significant weight to the medical expert's

opinion, which ALJ expounded in approximately two and a half pages of his determination. Tr.

29-31. *See also Shimkus v. Apfel*, 72 F. Supp.2d 1056, 1059 (S.D. Iowa 1999) ("the fact the ALJ

may have given greater weight to the opinions of nonexamining consultants than to [the treating

physician] is not reversible error provided the ALJ explained his reasons for doing so"); *Davis v.*

*Schweiker*, 671 F.2d 1187, 1189 (8th Cir. 1982).

Thus, the Court finds no error in the ALJ's treatment of Dr. Buitrago's opinions provided

in the course of two hearings.

### 2. Dr. Patrick

The ALJ gave "some weight" to a November 2015 psychological evaluation report by M.

Renee Patrick Ph.D. Tr. 27, 1745-54. Included in the report was Dr. Patrick's opinion that

Plaintiff would benefit from supported employment services and job sampling might help him

find suitable employment. Tr. 27, 1750. The ALJ found this comment suggested "the potential

[of Plaintiff] to perform some jobs with restrictions to account for the claimant's impairments."

Tr. 27. Plaintiff takes issue with this statement stating, "Dr. Patrick's opinion was not used as

support for the ALJ's opinion, so much as it was set aside as not-contradictory." However,

Plaintiff does not explain how the ALJ's comment that a particular medical evaluation did not

contradict his opinion would be reversible error, and the Court cannot find any independent

support for such a contention.

Additionally, in evaluating Dr. Patrick's report, the ALJ stated: "Dr. Patrick noted

significant depressive symptoms that Dr. Robison's notes at that time do not reflect" and "given

the claimant's ability to live alone for an extended period during the period at issue, the

statements do not necessarily contradict medical improvement related to the ability to work."

Plaintiff takes issue with these statements by the ALJ because Plaintiff was on Lamictal, a mood

stabilizer due to irritability, in addition to the possibility that "Plaintiff may not present as depressively to [Dr. Robison] as he did to less familiar sources." ECF No. 17 at 12. The Court cannot find the ALJ committed a reversible error by his determination that Dr. Robison's notes did not reflect the level of depression described in Dr. Patrick's report. Nor did the ALJ err by not considering the possibility Plaintiff would have been more forthright with a one-time medical evaluator than his own treating physician. In the Court's independent review of the record, there is no evidence to support Plaintiff's dishonesty with his treating physicians. In fact, Plaintiff exhibited such candor to Dr. Robison that he openly discussed his use of illegal substances, such as marijuana and methamphetamines. Tr. 1814. Moreover, there is substantial evidence in the medical record for the ALJ to determine Plaintiff's depression was not as severe as indicated in Dr. Patrick's evaluation despite the fact he was prescribed a mood stabilizer.

Thus, the Court finds no error in the ALJ's treatment of Dr. Patrick's psychological examination report.

### 3. Dr. Robison

The ALJ opinion exhaustively addressed and relied upon Dr. Robison's Progress Notes from October 2014, January 2015, August 2015, October 2015, April 2016, May 2016, July 2016, and November 2016 to support Plaintiff's medical improvement and stability of his symptoms. Tr. 21-23. Plaintiff does not argue against the ALJ's reliance on those records. Instead, Plaintiff specifically takes issue with the ALJ's assignment of "limited weight" to Dr. Robison's 2015 opinion and "little weight" to his 2017 opinion.

The 2015 opinion to which Plaintiff appears to refer is Dr. Robison's two-page letter to the Disability Determinations Hearing Officer, dated May 14, 2015. This letter was written at the request of Plaintiff after he received notice of the cessation of his benefits due to medical

improvement. Tr. 25, 1731-32. Dr. Robison summarized Plaintiff's medical conditions and

opined it would be difficult for him to transition into a work setting. Tr. 1732. Dr. Robison noted,

however, Plaintiff's symptoms had been relatively stable over the last year or two and he had

significantly reduced or eliminated alcohol or marijuana use. *Id.* The ALJ found this letter to be

contrary to Dr. Robison's October 13, 2014 Progress Note which approved Plaintiff's

discontinuance of the Abilify prescription, illustrating medical improvement, and his prior

assessment that many adolescents with Plaintiff's mental impairments improve over time. Tr. 25.

The Court finds it was appropriate for the ALJ to find Dr. Robison's letter to the agency

inconsistent with the content of his treatment records evidencing Plaintiff's ability to either be

off of medication or have an improved condition if taking his medication as directed. *See*

*Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir.2009) ("It is permissible for an ALJ to discount

an opinion of a treating physician that is inconsistent with the physician's clinical treatment

notes."); *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) ("ALJ may give a treating doctor's

opinion limited weight if it provides conclusory statements only . . . or is inconsistent with the

record"). Additionally, the ALJ appropriately discredited Dr. Robison's opinion that Plaintiff

would have difficulties maintaining employment because a "treating physician's opinion that a

claimant is disabled or cannot be gainfully employed gets no deference because it invades the

province of the Commissioner to make the ultimate disability determination." *House v.*

*Astrue*, 500 F.3d 741, 745 (8th Cir. 2007); *see also Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir.

2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves

an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to

which the Commissioner gives controlling weight"); *Zeier v. Colvin*, 4:15-CV-00156-RWS-

SPM, 2016 WL 1068995, at *9 (Feb. 16, 2016) (statement that Plaintiff cannot work is not entitled to deference).

The 2017 record is a checklist form filled out by Dr. Robison who indicated marked limitations in Plaintiff's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage oneself. Tr. 1847-48. In review of this document, the ALJ found the areas in which Dr. Robison indicated with marked limitations was not supported by the evidence of record, including Dr. Robison's own treating notes which indicated Plaintiff's mental status exams to be largely normal and his conditions to be stable, in addition to Plaintiff's own self-reported activities of daily living and ability to live alone for three years. Tr. 26.

Even a treating physician's check marks on a questionnaire are conclusory opinions that may be discounted if, as in this case, they are contradicted by other objective medical evidence in the record, especially when that other evidence is the doctor's own records. *See Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004); *see also Holstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (noting the limited probative value of a "checklist" RFC assessment); *see also Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) (It is appropriate to disregard statements of opinion by a treating physician that "consist[s] of nothing more than vague, conclusory statements"). Further, the ALJ appropriately considered Plaintiff's own reported activities in discrediting Dr. Robison's opinions of marked limitations. *See Merritt v. Astrue*, 609 F. Supp. 2d 850, 864 (E.D. Mo. 2009) (ALJ appropriately observed plaintiff's report that he lived on his own for four to five months which was inconsistent with the marked limitations noted by his treating physician).

Thus, the Court finds no error in the ALJ's treatment of Dr. Robison's 2015 and 2017 opinions.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff Jared William Burke's Complaint is **DISMISSED, with prejudice**. A separate judgment will accompany this Memorandum and Order.

So Ordered this 1st day of December, 2020.

*/s/ Stephen R. Welby*_____
**STEPHEN R. WELBY**
**UNITED STATES MAGISTRATE JUDGE**